JOSEPH R. CULHANE AND MARION C. CULHANE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57573. Filed January 22, 1959.

*John B. Huffaker, Esq.*, and *Joseph W. Price 3d, Esq.*, for the petitioners.

*Max J. Hamburger, Esq.*, for the respondent.

766

774

OPINION.

TURNER, *Judge:* At no time prior to the conclusion of the settlement on July 28, 1949, was petitioner a stockholder of Wilmington. And regardless of the formalities indulged in in bringing the settlement about, under which petitioner became the sole stockholder of Wilmington, it is patent, we think, that none of the transfers made in effecting the settlement may be regarded as the payment, either actual or constructive, of a dividend by Wilmington to petitioner.

Looking past the formalities indulged in, we have here, by specified transfers and assignments and joint and mutual releases, the settlement and satisfaction of all claims and cross-claims by and between the participants in the said settlement, other than claims specifically excepted. Petitioner was making claim against Wilmington for personal injuries resulting from the airplane crash and for compensation for prior services. He was making a similar claim for compensation against Edge Moor. Alexandrine, in her own right and through Perkins' estate, was the owner of all of the Wilmington stock. At the same time, she, Perkins' estate, Edge Moor, and the Highland Gardens Realty Company were indebted to Wilmington in substantial and, in the main, in undisputed amounts. Alexandrine was not interested in the continued ownership of Wilmington, but did desire to retain her interests in Edge Moor. In such circumstances, the parties negotiated and settled the various claims of all parties; not individually, but interdependently and as a group, the result of which was that by the transfer of the Wilmington stock to petitioner, Alexandrine received the notes and receivables owned by Wilmington against her, Perkins'

estate, Edge Moor, and Highland Gardens, plus $5,335.34 in cash. The petitioner, in addition to the receipt of the Wilmington stock, which was transferred directly to him by Alexandrine, also received in cash a net amount of $15,986.95 from Wilmington, and in addition, he received in satisfaction of his claim for damages for personal injuries $35,000 from Wilmington and $5,000 from Wilmington's insurer. The petitioner in turn released Wilmington and Edge Moor from his claims against them for compensation for prior services.

It is true that the resolution adopted by the board of directors immediately after petitioner took control of Wilmington did recite that petitioner had received a loan of $450,000 from Wilmington, in the form of assignments of the various receivables and cash, and that the loan was to be evidenced by a note, and further, a note was actually executed by petitioner and his personal account on Wilmington's books was debited with the amount thereof. It is also true that, by credits, the nature of which is not shown, the debit balance in petitioner's account on Wilmington's books was reduced to an amount below $450,000, namely, to $437,569.83, at some time during 1953. We are convinced, however, that the language of the resolution, the giving of the note, and the entry of the amount thereof as a debit against petitioner on Wilmington's books, though formalities indulged in in effecting settlement, were not of the substance of the settlement effected, wherein and whereby petitioner acquired all of Wilmington's stock.

Aside from the unexplained credit in 1953 reducing petitioner's debit balance on Wilmington's books to an amount less than the face of the note, there is no evidence that any effort was ever made to collect the note. The note itself was misplaced, lost, or discarded prior to the time of the trial herein, with no apparent effort to replace or collect it. According to the record, Wilmington, though still in existence, was dormant, but as to the disposition of the corporate assets, it is silent. Furthermore, it is clear, we think, that any obligation on the part of petitioner which might be said to have arisen with respect to his receipt of the above-mentioned receivables, which he immediately assigned to Alexandrine, was covered by the joint and mutual release executed as a part of the settlement and by all of the parties to the said settlement. By the terms of this release, all claims, except those specifically enumerated, were released, and though petitioner's prior debt to Wilmington and certain of the contemporaneously created obligations were specifically excepted from release, there was no mention or exclusion of the purported debt of $450,000, although, if ever of substance, it was in existence at the time Wilmington joined with the others in the execution of the release.

Petitioner contends that no consideration was received by him in satisfaction of his claim for compensation. He relies upon the testimony of the attorneys for the parties to the settlement. It is to be

noted, however, that the letter of petitioner's attorney to Alexandrine's attorney, under date of July 28, 1948, clearly stated that petitioner reserved the right to press his claim to the profits of both Wilmington and Edge Moor if no settlement was reached, but in the event of a settlement, the claim against Edge Moor would be released and protracted and expensive litigation avoided. In matter of fact, the settlement as finally agreed upon included the release by petitioner of his claims to the profits of Wilmington as well as Edge Moor.

It is our opinion, on the facts of record, that in satisfaction of his claims for compensation for prior services he had rendered to Wilmington and Edge Moor, petitioner received the stock of Wilmington and cash in a net amount of $15,986.95, and as compensation, the cash and the Wilmington stock in the amount of its fair market value are taxable to him as ordinary income. We so hold.

It is apparent from the evidence, we think, that as between the parties the settlement, including the value at which the Wilmington stock was taken into account, was based on the value of the Wilmington assets. It would thus appear that in agreeing to the settlement, the petitioner accepted the Wilmington stock at the value represented by the Wilmington assets, after the cash distribution, part of which went to Alexandrine with the remainder being retained by him, and after the assignment of the notes and receivables, which were assigned to Alexandrine along with the above-indicated cash. The facts further show that for the purposes of settlement the net value of the assets as retained by Wilmington was $397,396.43, as set out in our Findings of Fact. This value represents the asset value shown by a "balance sheet audit" prepared as of November 30, 1948, and later reduced by the "write-down" of one asset and the expenses of operation during the period November 30, 1948, to July 28, 1949, all of which was in keeping with the basis of settlement agreed upon.

At the trial, the petitioner, in the course of his testimony, questioned such asset value with respect to only one of the assets retained by Wilmington. As to that asset, he testified merely that it had been appraised at a stated figure which was less than the book value at which it had been included. The appraiser was not identified or called to testify, and the evidence does not, in our opinion, justify a finding other than that the fair market value of the assets was equal to the book or "balance sheet audit" value, as agreed upon by the parties for the purpose of settlement.

Petitioner makes the further argument that the fair market value of the assets was greater than the fair market value of the stock of Wilmington because the company was subject to certain contingent liabilities. These liabilities were a contingent liability for Federal income tax, claimed sales commissions, which were the subject matter

of a pending suit, and such liability as Wilmington might have under a bond supported by mortgages on a number of residential properties.

The joint and mutual release executed as a part of the settlement indicates that the contingent Federal tax liability was covered by an agreement by Alexandrine to indemnify petitioner and Wilmington with respect thereto. We can only conclude that this indemnification would effectively relieve Wilmington of any liability for possible income tax deficiencies relating to prior years.

With respect to the sales commissions, the evidence does not indicate that the parties either did not know or reasonably expect at the time of settlement that the suit for commissions would be concluded, as shortly thereafter it was, without liability to Wilmington.

As to the bond and the individual mortgages, the record does not show the exact nature of the contingent liability, but the impression from the evidence is that Wilmington was only secondarily liable and the mortgages were well secured by the residences to which they attached. There is no claim or indication that any losses were ever sustained.

In such circumstances, and on the evidence appearing, we have concluded that the contingent liabilities did not reduce the fair market value of the Wilmington stock to an amount less than the value of the supporting or underlying assets. We have accordingly found as a fact that the fair market value of the Wilmington stock received by petitioner pursuant to the settlement was at the time of receipt $397,396.43.

*Decision will be entered under Rule 50.*